UNITED STATES

v.

Joseph P. GANIM.

No. 3:01CR263(JBA).

United States District Court,
D. Connecticut.

Sept. 12, 2002.

Ronald Scott Apter, U.S. Attorney's Office, Hartford, CT, John A. Danaher, III, James I. Glasser, Michael R. Sklaire, U.S. Attorney's Office, New Haven, CT, for Plaintiff.

Roland Acevedo, Seiff, Kretz, Maffeo, New York City, Richard T. Meehan, Jr., Edward J. Gavin, Michael T. Meehan, Meehan & Meehan, Bridgeport, CT, Rosemarie T. Weber, Morrison, Mahoney & Miller, LLP, Hartford, CT, J. Bruce Maffeo, New York City, for Defendant.

### *Ruling on Motion to Dismiss Indictment [Doc. # 50]*

ARTERTON, District Judge.

The primary issues presented in this motion by Bridgeport Mayor Joseph Ganim to dismiss the indictment pending against him are Ganim's contentions that portions of the indictment's "honest services" mail fraud allegations must fail because (1) the mail fraud statute under which they are brought does not provide the requisite notice that the acts alleged in the indictment are proscribed by the statute and (2) the indictment's allegations of an ill-defined scheme fail to provide him with the notice of what he is alleged to have done that violates that law. While Ganim's argument has currency given the wording of both the statute and indictment, the Government at the conclusion of oral argument on this motion clarified that this scheme will be prosecuted at trial only as a scheme to deprive the citizenry of Ganim's honest services by bribery of (or extortion by) an elected official. Thus, the jury's consideration will be confined to whether the Government has proved a scheme whereby Ganim demanded, sought, received or agreed to receive something of value either with the specific corrupt intent to be influenced in the performance of an official act (bribery) or through the unlawful use of force, violence or fear (extortion).

Additionally, the Court *sua sponte* vacates part of its earlier ruling denying Ganim's request for a bill of particulars and directs the Government to provide particularization of the specific benefits Ganim is alleged to have unlawfully received. With these clarifications and limitations, the Court concludes that the indictment (read in light of the forthcoming bill of particulars) charges offenses for which the mail fraud statute provides the requisite notice that the acts are criminalized by the statute, and gives Ganim adequate notice of the charges against him.

Ganim's remaining arguments, which address the RICO counts, other aspects of the mail fraud charges, and the constitutionality of the federal-program bribery statute, are either without merit or must

await determination at trial after the presentation of the Government's evidence. For the reasons elaborated below, the defendant's motion to dismiss is denied in its entirety, the Court's order denying Ganim's motion for a bill of particulars is vacated in part, and a bill of particulars setting out the specific benefits Ganim is alleged to have received is ordered.

## I. Introduction

On October 31, 2001, a federal grand jury returned a 24 count indictment against Ganim, the sitting mayor of Bridgeport, Connecticut. Ganim filed a motion to dismiss portions of the indictment on March 15, 2002. On March 27, 2002, a Superseding Indictment was filed, and on July 1, 2002 oral argument was held.

The first count of the indictment[1] charges Ganim with violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO"). Ganim is alleged to have been engaged in a racketeering enterprise with Pinto, Leonard Grimaldi, the Office of the Mayor, and unnamed others. The *modus operandi* of

the enterprise is alleged to have been the solicitation and acceptance of various bribes and kickbacks from companies and individuals seeking to do business with the City of Bridgeport ("City" or "Bridgeport"), as well as other attempts to realize unlawful gain. Ganim is alleged to have engaged in eleven racketeering acts: (1) in connection with the privatization of Bridgeport's waste waster system, Professional Services Group ("PSG"), the low bidder on the contract, was forced to pay Pinto and Grimaldi $311,000 to obtain the contract, in violation of the Hobbs Act[2] and the federal mail fraud statute[3]; (2) in connection with the extension of the waste water contract, Ganim is alleged to have received $156,000 (through Pinto and Grimaldi) from PSG, in violation of the Connecticut bribe receiving statute[4] and the federal mail fraud statute; (3) in connection with the construction of the Harbor Yard Stadium, Ganim is alleged to have taken (through Pinto and Grimaldi) cash and other property, including meals and entertainment, from the Kasper Group, in violation of the federal mail fraud statute; (4) in connection with the construction of a

---

**1.** All references to the indictment are to the Superseding Indictment.

**2.** 18 U.S.C. § 1951(a) ("Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both."). "The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

**3.** 18 U.S.C. § 1341 ("Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or

property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing ... is guilty of mail fraud."). "[T]he term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

**4.** Conn.Gen.Stat. § 53a–148(a) ("A public servant ... is guilty of bribe receiving if he solicits, accepts or agrees to accept from another person any benefit for, because of, or as consideration for his decision, opinion, recommendation or vote.").

hockey arena, Ganim is alleged to have taken (through Pinto and Grimaldi) cash and other property, including meals and entertainment, from the Kasper Group, in violation of the federal mail fraud statute; (5) Ganim is alleged to have used City funds to buy himself a $1 million life insurance policy, in violation of the federal mail fraud statute; (6) Ganim is alleged to have violated the Hobbs Act by extorting a $5,000 kickback from Frank Sullivan, a financial consultant, on the commission Sullivan earned in connection with the City's purchase of the life insurance policy; (7) Ganim is alleged to have violated the Connecticut bribe receiving statute and the federal mail fraud statute in selecting Sullivan as financial advisor and broker for municipal pension plans in return for payment to Ganim and Pinto of a portion of any commissions; (8) Ganim is alleged to have received (through Pinto) property from Alfred Lenoci, Jr., president of UER, in exchange for selecting UER and Harbor Communications to oversee City programs funded by Bridgeport Energy, in violation of the Connecticut bribe receiving statute and the federal mail fraud statute; (9) Ganim is alleged to have violated the federal mail fraud statute in taking $50,000 (through Pinto) from B & C Gravel for supporting relocation of the juvenile court; (10) Ganim is alleged to have received property for selecting a company owned by Alfred Lenoci, Jr., and Alfred Lenoci, Sr., as the preferred developer for vacant strips of land in Bridgeport, in violation of the Connecticut bribe receiving statute and the federal mail fraud statute; and (11) Ganim is alleged to have violated the federal mail fraud statute by causing the City to extend sewer service to his residence cost-free.

In addition to the RICO allegations in count one, the majority of the racketeering acts that form the basis of the RICO count correspond to substantive counts of the indictment. For example, the Hobbs Act violation in Racketeering Act 6 (the alleged life insurance kickback) also forms the basis of the substantive Hobbs Act violation found in Count Fifteen. The two counts of false tax returns are not the subject of Ganim's motion to dismiss.

## II. Standard

"The indictment ... shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c)(1). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (citations omitted). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly ... set forth all the elements necessary to constitute the offence intended to be punished." *Id.* at 177, 94 S.Ct. 2887 (quotations omitted). The indictment "must descend to particulars," however, if "the definition of an offence ... includes generic terms." *United States v. Cruikshank*, 92 U.S. 542, 558, 2 Otto 542, 23 L.Ed. 588 (1875) (citation omitted); *accord United States v. Pirro*, 212 F.3d 86, 92–93 (2d Cir.2000).

In the absence of a full proffer of the Government's evidence, "the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment," *United States v. Alfonso*, 143 F.3d 772, 776–777 (2d Cir.1998) (reversing dismissal of an indictment when the district court "looked beyond the face of the indictment and drew inferences as to the proof that would be introduced by the

government at trial" to satisfy an element of the charge); *accord Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956) (If "valid on its face," a grand jury indictment "is enough to call for trial of the charge on the merits.") (citations and footnote omitted).

### III. Vagueness / Notice of Charges

In Racketeering Acts 1B, 1C, 1D, 2B, 3A, 3B, 4A, 4B, 5A, 5B, 7B, 7C, 7D, 8B, 9, 10B, 11A and 11B (and the corresponding substantive counts 4–6, 8–14, and 17–21) of the indictment, Ganim is charged with violating the federal mail fraud statute, 18 U.S.C. § 1341.[5] Only four[6] of the charged mail fraud Racketeering Acts charge what may be termed 'traditional' mail fraud; that is, a scheme to "obtain[ ] money or property by means of false or fraudulent pretenses, representations, or promises...." (These counts are not the subject of Ganim's vagueness arguments.) The remaining ten[7] are brought under 18 U.S.C § 1346, which provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."

Ganim advances two separate challenges to these "honest services" portions of the indictment: (1) the statute under which they are brought does not provide the requisite notice that the acts alleged in the indictment are proscribed by the statute and (2) the indictment's lack of particularity as to the benefits he is alleged to have received fails to provide him with notice of what he is alleged to have done that violates that law.

### A. Notice that the Alleged Conduct is Prohibited by the Mail Fraud Statute

This argument proceeds in two steps. First, Ganim asserts that the "honest services" portions of the indictment allege as crimes only the receipt by a public official of gratuities, without any allegation of intent to be corruptly influenced. For example, the indictment charges that in January 1997, Alfred Lenoci, Jr., hired Paul Pinto to assist Lenoci's company, United Environmental Redevelopment ("UER"), in obtaining environmental remediation and demolition contracts in Bridgeport. Pinto allegedly used a portion of the fees he received from UER "to provide personal benefits," which the indictment alleges include but are not limited to cash, meals, entertainment and merchandise, to Ganim. UER was subsequently selected for several City projects. On these facts, the indictment charges that Ganim is guilty of federal mail fraud in that he "knowingly devised and participated in a scheme or artifice to defraud and deprive the citizens of Bridgeport of their right to the honest and impartial performance of the official duties of the Mayor...." ¶ 209.

While the indictment alleges that the giver of the gifts intended for Ganim to be influenced, the indictment is silent as to Ganim's alleged state of mind in receiving

---

**5.** "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing ... is guilty of mail fraud."

**6.** Racketeering Acts 5A, 5B, 11A and 11B.

**7.** Racketeering Acts 1B, 1C, 1D, 2B, 3A, 3B, 4A, 4B, 7B, 7C, 7D, 7E, 8B, 8E, 9, and 10B.

the alleged meals and other gifts.[8] The Government's initial position at oral argument confirmed its view that Ganim's intent to participate in this "scheme" sufficed to support a charge under the mail fraud statute. The Government refers only to a "corrupt link between a benefit and an official act," arguing that the crux of the crime is an undefined scheme: "It's the government's burden to prove beyond a reasonable doubt that there is intent there, intent to defraud, intent to participate in this scheme, and we're talking about a scheme to defraud." Tr. [Doc. # 70] at 23. "It's the scheme. It's the intent to defraud. It's the entering into these agreements to conduct this illegal business outside of the awares of the citizens of Bridgeport...." Tr. [Doc. # 70] at 29.

Next, Ganim points to the lack of specificity in the mail fraud statute itself, arguing that even if the statute can properly be given the Government's expansive reading, it cannot be said to provide sufficient notice that the receipt of personal benefits, without a corrupt intent on the part of the recipient, is unlawful under that statute, and thus is constitutionally infirm. *See, e.g., Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids.") (citations omitted); *Papachristou v. City of Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). He highlights this argument by pointing to the specific element of other laws, such as the Connecticut bribe receiving statute, Conn.Gen.Stat. § 53a–148(a) ("A public servant ... is guilty of bribe receiving if he solicits, accepts or agrees to accept from another person any benefit *for, because of, or as consideration for* his decision, opinion, recommendation or vote:") (emphasis added); 18 U.S.C. § 666(a)(1)(B) (prohibiting certain municipal officials from "corruptly solicit[ing] or demand[ing] for the benefit of any person, or accept[ing] or agree[ing] to accept, anything of value from any person, *intending to be influenced or rewarded in connection with* any business, transaction, or series of transactions" of the municipality) (emphasis added); and the provisions of the Bridgeport Ethics Code that allow for the receipt of gifts by public office holders so long as the gifts are not received "under circumstances in which it can reasonably be inferred that the gift is intended to influence him in the performance of his duties or employment in the public interest," Bridgeport Ethics Code § 2.38.030(B)(1), and specifically exclude even from this prohibition "food or beverage or both, consumed on a single occasion, the cost of which is less than fifty dollars ($50.00) per person," *id.* § 2.38.020.

The use of an "honest services" theory of criminality under the mail fraud statute began as an uncodified interpretation of the statute that gained currency in the lower courts:

> After [Congress amended the statute in 1909], the mail fraud statute criminalized schemes or artifices "to defraud" or "for obtaining money or property by means of false or fraudulent pretenses,

---

8. The mail fraud portion of this charge is alleged as Racketeering Act 8B, which is composed of ¶¶ 108–110. These paragraphs incorporate by reference ¶¶ 8(c) and 100–106. It is only in ¶ 107 (which is not incorporated by reference), however, that Ganim is alleged to have received these personal benefits "as consideration for" his selection of UER. Thus, while Racketeering Act 8A (Connecticut Bribe Receiving) charges that Ganim specifically intended to be influenced when he received the alleged benefits, Racketeering Act 8B (Mail Fraud) contains no such allegation.

representation[s], or promises...." Because the two phrases identifying the proscribed schemes appear in the disjunctive, it is arguable that they are to be construed independently and that the money-or-property requirement of the latter phrase does not limit schemes to defraud to those aimed at causing deprivation of money or property. This is the approach that has been taken by ·each of the Courts of Appeals that has addressed the issue: schemes to defraud include those designed to deprive individuals, the people, or the government of intangible rights, such as the right to have public officials perform their duties honestly.

*McNally v. United States*, 483 U.S. 350, 358, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (*citing United States v. Clapps*, 732 F.2d 1148, 1152 (3rd Cir.1984); *United States v. States*, 488 F.2d 761, 764 (8th Cir.1973)). In 1987, the Supreme Court rejected this construction, noting the potential for ambiguity inherent in the honest services doctrine: "Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the federal government setting standards of disclosure and good government for local and state officials, we read § 1341 as limited in scope to the protection of property rights." *Id.* at 360, 107 S.Ct. 2875.

In response to *McNally*, Congress enacted § 1346, which codifies the interpretation of the statute that had been adopted by the lower courts before *McNally*. While some courts resurrected pre-*McNally* standards of honest services deprivation after the enactment of § 1346, *e.g., United States v. Frost*, 125 F.3d 346, 364 (6th Cir.1997), the Second Circuit expressly rejected this course in *United States v. Sancho*, 157 F.3d 918, 922 (2d Cir.1998) ("What the government must prove to satisfy [the honest services] element of the offense is defined by § 1346—

not by judicial decisions that sought to interpret the mail and wire fraud statutes prior to the passage of § 1346.").

In light of the rejection of pre-*McNally* case law defining the scope of the honest services prohibition and the inherent malleability of the term "honest services," a recent Second Circuit opinion has expressed doubts as to the constitutionality of the "honest services" provision:

The plain meaning of "honest services" in the text of § 1346 simply provides no clue to the public or the courts as to what conduct is prohibited under the statute. Judge Jolly observed in 1997 that the terms "intangible right" and "honest services" cannot be found in Black's Law Dictionary, the United States Code, or (for that matter) any federal statute other than § 1346. That observation remains accurate today. Clearly, " 'honest services' has not achieved the status of a commonly accepted and recognized term of art which Congress could have been relying upon in using these words.... The phrase is ... inherently undefined and ambiguous."

*United States v. Handakas*, 286 F.3d 92, 104 (2d Cir.2002) (*citing* and *quoting United Stated v. Brumley*, 116 F.3d 728, 742, 746 (5th Cir.1997) (Jolly, J., dissenting)); *see also id.* ("If we were the first panel [of the Second Circuit] attempting to discern the meaning of the phrase 'honest services' in § 1346, we would likely find that part of the statute so vague as to be unconstitutional on its face.").

The *Handakas* majority's concerns are well-illustrated in this case. If an elected official in Connecticut attempted to determine whether his or her receipt of gratuities, without any corrupt intent, violated the federal mail fraud statute, there would be little guidance available. If the official looked to municipal ethics codes, the an-

swer would depend on which town the official lived in. Some municipal ethics codes flatly prohibit all gifts, *see, e.g.,* West Hartford Code § 16–9 [9]; New Haven Code Art. XXXVII § 211,[10] Norwich Code Art. IV § 2–54(c),[11] while others are more circumscribed in their prohibitions, *e.g.,* Danbury Code § 2–166(a)(3).[12] *Compare, e.g.,* the codes cited above containing blanket prohibitions on all gifts, *with, e.g.,* Hartford Municipal Code § 2–459 (excluding from the definition of "gift" anything costing less than $100 and "food or beverage or both, costing less than fifty dollars ($50.00) per person and consumed on a single occasion at which the person paying [for the meal] is in attendance)" and Bridgeport Code of Ethics 2.38.020 (set out above). Additionally, an elected official looking to other provisions of federal law for guidance [13] as to whether § 1341 prohibited receipt of all gratuities would note that there is a specific statute, 18 U.S.C. § 201(c)(1)(B), addressing this conduct, called "illegal gratuity statute" by the Supreme Court.[14] While only applicable to federal officials, *see* 18 U.S.C. § 201(a)(1), the statute prohibits the receipt of "anything of value" by a present, past, or future public official "for or because of any official act performed or to be performed by such official or person," and thus prohibits conduct that is less than outright bribery.[15] Inasmuch as a federal official would be subject to both the "honest services" provision of the mail fraud statute and this illegal gratuity statute, to interpret the statutes as meaning that conduct made unlawful by the latter, more specific statute (with its two year maximum penalty) would also be covered by the former, non-specific statute (with its twenty year maximum penalty) is counterintuitive. *Compare* 18 U.S.C. § 201(c) (possible imprisonment of two years) *with* 18 U.S.C. § 1341 (possible imprisonment of twenty years).

■ The *Handakas* court, however, did not hold § 1346 facially unconstitutional,

---

**9.** No official "shall accept or solicit any gift, whether in the form of service, loan, thing, promise or any other form, from any person who, to his or her knowledge, is interested, directly or indirectly, in any manner whatsoever, in business dealings with the town, *or* which gift may tend to influence such officer, official or employee in the discharge of his or her official duties ..." (emphasis added).

**10.** "The receipt of any valuable gift, thing, loan or promise by any elected official ... from any person [who] to his knowledge is directly interested in any business dealing with the city" is grounds for removal from office.

**11.** "No officer, official or employee shall accept or solicit any gift, whether in the form of service, loan, thing, promise or any other form, from any person who, to his or her knowledge, is interested, directly or indirectly, in any manner whatsoever, in business dealings with the city, or which gift may tend to influence him or her in the discharge of official duties or in granting any improper favor, service or thing of value."

**12.** Prohibiting only acceptance of gifts "based on any understanding that the vote, official action, or judgment of the [official] would be or had been influenced thereby."

**13.** *E.g., Kokoszka v. Belford,* 417 U.S. 642, 650, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974) (when interpreting a statute, consideration must be taken of other statutes on the same subject).

**14.** *United States v. Sun–Diamond Growers of California,* 526 U.S. 398, 400, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999).

**15.** While bribery entails a *quid pro quo,* "[a]n illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." *Sun–Diamond Growers,* 526 U.S. at 404–405, 119 S.Ct. 1402.

noting that two prior panel decisions, *Sancho* and *United States v. Middlemiss*, 217 F.3d 112 (2d Cir.2000), had given some content to the honest services language. *Handakas*, 286 F.3d at 106–107; *see also United States v. Rybicki*, 287 F.3d 257, 263–264 (2d Cir.2002). The Second Circuit has recently decided to consider, *en banc*, whether the statute is unconstitutionally vague on its face. *See* Order, *United States v. Rybicki*, Nos. 00–1043(L), 00–1044(CON), 00–1052(XAP), 00–1055(CON) (2d Cir. July 3, 2002) (accepting *en banc* review of panel decision reported at 287 F.3d 257 and directing parties to brief "whether 18 U.S.C. § 1346 is unconstitutionally vague on its face"). However, unless and until a contrary decision is reached in the *en banc* consideration of *Rybicki*, the controlling law of this Circuit is that § 1346 is not unconstitutional on its face.

■ Ganim concedes as much, Tr. [Doc. # 70] at 39–40, and agrees that if the honest services provisions of the indictment are construed as charges of a bribery [16] or extortion scheme, his vagueness claims would be obviated, *see id.* at 8 and 41–42. At the conclusion of oral argument and in response to these vagueness concerns, Government represented that the honest services charges tried to the jury will be limited to a scheme of bribery or extortion by Ganim, *see id.* at 43–44; *cf. also* Govt's Supp.Mem. [Doc. # 67] at 5 n. 5 (asserting that "like the federal mail fraud statute," the federal-programs brib-

ery statute [18 U.S.C. § 666] "does not provide a safe haven for public officials who corruptly accept bribes and other personal benefits from lobbyists *intending to be influenced* in the exercise of their official duties") (emphasis added; citations omitted).

Construing the indictment in this fashion ensures that Ganim had sufficient prior notice of the unlawfulness of the criminal acts he is alleged to have committed. Insofar as § 1346 contains an ascertainable standard of conduct (and the law in this Circuit is that it does), bribe receiving and extortion by elected officials are squarely within the heartland of the statute, as represented by the cases distinguished by the *Handakas* majority. *See Handakas*, 286 F.3d at 111–112 (distinguishing *United States v. Frega*, 179 F.3d 793, 803 (9th Cir.1999) (bribery of state judges); *United States v. Brumley*, 116 F.3d 728, 732–33 (5th Cir.1997) (*en banc*) (bribe solicitation by state employee); *United States v. Paradies*, 98 F.3d 1266, 1282–83 (11th Cir. 1996) (bribery of a public official)).[17]

■ Without doubt, an elected official is on notice that demanding, seeking, receiving or agreeing to receive something of value either with the specific intent to be influenced in the performance of an official act or through the unlawful use of force, violence or fear, is unlawful and is criminalized by numerous statutes. *See, e.g.,* Conn.Gen.Stat. § 53a–148(a); 18 U.S.C. § 666(a)(1)(B); 18 U.S.C. § 1951(a). Since

---

**16.** "[F]or bribery there must be a *quid pro quo*—a specific intent to give or receive something of value in exchange for an official act." *United States v. Sun–Diamond Growers of California*, 526 U.S. 398, 404–405, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999).

**17.** Although the convictions upheld as constitutional in *Rybicki*, *Sancho* and *Middlemiss* involved schemes "in which the defendant breached or induced the breach of a duty

owed by an employee or agent to his employer or principal that was enforceable by an action at tort," *Rybicki*, 287 F.3d at 264 (*citing Handakas*), "*Rybicki's* description of cases that have upheld convictions pursuant to § 1346 is not exhaustive of all the situations that satisfy the statute," *United States v. Viertel*, No. S2 01 CR. 571(JGK), 2002 WL 1560805 at *9 (S.D.N.Y. July 15, 2002).

the honest services portions of the indictment will be construed as allegations of bribery or extortion by an elected official, Ganim has no standing to challenge other, possibly unconstitutional applications of the statute, unless the Second Circuit determines that the statute is facially unconstitutional. *See Parker v. Levy,* 417 U.S. 733, 755–756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (in an as-applied vagueness challenge, "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness"; if, however, a statute is unconstitutional on its face, it is vague " 'in the sense that no standard of conduct is specified at all' ") (*quoting Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971)).

### B. Notice of Pending Charges

■ Ganim next takes issue with the indictment's lack of particularity regarding the benefits he is alleged to have received in exchange for official acts. *See, e.g., United States v. Lamont,* 236 F.2d 312 (2d Cir.1956) ("It is of course the function of an indictment to set forth without unnecessary embroidery the essential facts constituting the offense and thus accurately acquaint the defendant with the specific crime with which he is charged.") (*citing, inter alia,* Fed.R.Crim.P. 7(c)). Although the list of benefits in ¶ 8(c) has a veneer of precision in that it alleges specific gifts along with the alleged value and date of the gift (e.g., the list contains a men's suit valued at $1,700 allegedly received in January 1996), this precision evaporates upon closer examination. The indictment includes the clause "among others" in the sentence introducing the list, and at oral argument the Government represented that the list is "by no means exclusive," and is only "an exhaustive list of the types of benefits" allegedly provided to Ganim. Tr. [Doc. # 70] at 25. Inasmuch as ¶ 8(c) contains myriad *types* of benefits (e.g.,

clothing, appliances, jewelry, wine, professional services, landscaping services), the indictment as it stands gives Ganim insufficient notice of the benefits that he is alleged to have received. If, for example, the evidence at trial showed that the alleged $1,700 suit in January 1996 in fact never existed, or was paid for out of Ganim's own funds, or was a late Christmas gift from a relative, nothing precludes the Government from offering other evidence of this *type* of benefit, such as another suit, given on another date, as the actual benefit claimed in the Government's case.

Given this uncertainty, brought to the fore in oral argument, the Court concludes that a limited bill of particulars is warranted in this case. Fed.R.Crim.P. 7(f) provides:

> The court may direct the filing of a bill of particulars. A motion for a bill of particulars may be made before arraignment or within ten days after arraignment or at such later time as the court may permit. A bill of particulars may be amended at any time subject to such conditions as justice requires.

The Advisory Committee notes from a 1966 amendment eliminating the requirement of a showing of cause explain that this amendment was "designed to encourage a more liberal attitude by the courts toward bills of particulars without taking away the discretion which courts must have in dealing with such motions in individual cases."

■ "The proper scope and function of a bill of particulars is to furnish facts supplemental to those contained in the indictment which are necessary to apprise the defendant of the charges against him with sufficient precision so as to enable him to prepare his defense, to avoid unfair surprise at trial, and to preclude a second prosecution for the same offense." *United*

States v. Matos–Peralta, 691 F.Supp. 780, 791 (S.D.N.Y.1988) (*citing United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir. 1987)).

> It is repeated over and over again in the cases that a bill of particulars may not call for an evidentiary matter. Other cases say that the government will not be required to disclose its legal theory on a bill of particulars.... Any generalized propositions of this sort must necessarily be unsatisfactory. The bill of particulars ... is intended to give the defendant enough information about the charge so that he or she may adequately prepare a defense and so that surprise may be avoided. It is not intended, as such, as a means of learning the government's evidence and theories. But to the extent that information is needed for the proper purposes of the bill, it will be required even if the effect is disclosure of evidence or of theories.

Wright, Federal Practice and Procedure: Criminal 3d § 129 at 659–660 (*citing, inter alia, United States v. Russo,* 260 F.2d 849, 850 (2d Cir.1958)) ("It is obviously a matter of degree how far an accused must be advised in advance of the details of the evidence that will be produced against him, and no definite rules are possible. All that can be said is that he must know enough to be able to produce in season whatever evidence he may have in answer, and that the charge must become clear enough at the trial to make the judgment available to him on a future plea of 'former jeopardy.' ").

 While no bill of particulars is required if the information sought has been obtained through the discovery process, *Bortnovsky,* 820 F.2d at 574, the Government appears unwilling to concede that particularization of the benefits allegedly received will be provided by discovery. *See* Tr. [Doc. # 70] at 25–26; Govt's Opp. Mot. Bill of Particulars [Doc. # 31] at 12 (characterizing Ganim's request for particularization of benefits received as "tantamount to a request for the government to state its legal and evidentiary theories regarding the crimes alleged in the indictment . . .").

The Court concludes that insofar as Ganim's motion for a bill of particulars [Doc. # 26] sought particularization of the benefits allegedly provided to Ganim, whether actual or constructive, such particularization has now been shown to be necessary to enable him to prepare his defense and to avoid unfair surprise at trial, and thus the Court's ruling denying the motion will be vacated and the motion granted as to the benefits allegedly received. With this particularization, Ganim will have the requisite notice of the nature and scope of the charges pending against him, and thus dismissal of these counts of the indictment is not warranted.

### IV. Mail Fraud—"Furtherance"

Ganim also challenges several of the mail fraud counts as failing to meet the statutory requirement that the mailing in question be in furtherance of a fraudulent scheme. He argues that several of the mailings asserted in the Racketeering Acts and corresponding substantive counts must fail because they were not "in furtherance" of the alleged schemes or frauds identified in those counts. Specifically, Ganim takes issue with: (1) the PSG counsel letter in Racketeering Act 2B, which he contends was mailed before the scheme or fraud was agreed to; (2) the credit card statements in Racketeering Acts 3A and 4A; and (3) the quarterly life insurance report in Racketeering Act 5B.[18]

**18.** Ganim's claims relating to Racketeering Acts 1D and 1E are apparently moot in light

■ "[A] mailing is in furtherance of a fraudulent scheme when it is incidental to an essential part of the scheme or a step in the plot." *United States v. Tocco*, 135 F.3d 116, 124 (2d Cir.1998) (*citing Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954) and *Badders v. United States*, 240 U.S. 391, 394, 36 S.Ct. 367, 60 L.Ed. 706 (1916) (quotations omitted)). The Supreme Court's most recent application of this requirement was in *Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), involving a defendant used car wholesaler who had engaged in odometer fraud. Schmuck sold the tampered—with cars to retail dealers, who in turn sold them to consumers. In connection with these latter sales (retail dealers to consumers), the retail dealers mailed title application forms to the state. The Court affirmed Schmuck's mail fraud conviction, which was based on the title application mailings, determining that these mailings were "in furtherance" of the odometer-fixing fraud: "although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to Schmuck's scheme." *Id.* at 711–712, 109 S.Ct. 1443.

In *United States v. Slevin*, 106 F.3d 1086 (2d Cir.1996), the Second Circuit held that "[w]here the frauds are not isolated or related swindles, postfraud mailing of invoices, checks, or receipts may further the scheme by, for example, lulling the victims into believing they received the services fraudulently promised or by helping to keep the scheme in operation by preserving a needed business relationship between a fraud victim and defendant." *Id.* at 1089–1090 (*citing United States v. Pac-*

*cione*, 949 F.2d 1183, 1196 (2d Cir.1991); *United States v. Angelilli*, 660 F.2d 23, 36–37 (2d Cir.1981); *Schmuck*, 489 U.S. at 711–712, 109 S.Ct. 1443).

### A. Racketeering Act 2B

■ In Racketeering Act 2, Ganim is alleged to have solicited a $156,000 bribe from Pinto and Grimaldi in return for approving the extension of PSG's contract to manage waste water facilities. This was allegedly carried out by having Grimaldi enter into a new, $695,000 consulting agreement with PSG, and upon approval of the extension, Grimaldi would pay two-thirds of the fees he received to Pinto. Half of what Pinto received would be held for the benefit of Ganim. The indictment alleges that in furtherance of this scheme, a letter from PSG's legal counsel to Grimaldi regarding the consulting agreement was placed in the mail.

Ganim asserts that this mailing was not "in furtherance" of any alleged fraud because the letter was mailed on April 9, 1999, while the alleged scheme in which Grimaldi would pay Pinto (who would in turn pay Ganim) a portion of the fees was not agreed to until April 12, 1999. Thus, Ganim argues, the mailing preceded the scheme and cannot be "in furtherance" of the scheme.

The indictment alleges that when Grimaldi renegotiated his contract with PSG on April 9, 1999, he did so "with the knowledge and at the direction of [Ganim]." ¶ 28. The consulting agreement between PSG and Grimaldi is therefore alleged to be the first link in the chain that ultimately was to put money in Ganim's pocket in exchange for approval of the extension. Given the allegation that Ganim directed Grimaldi to renegotiate this

---

of the superseding indictment, which replaced the original allegations about credit card

statements with other mailings which are not addressed in Ganim's subsequent briefing.

contract, and given the centrality of this agreement to the April 12, 1999 agreement to split the fee among Grimaldi, Pinto and Ganim, the indictment is not facially flawed.

### B. Racketeering Acts 3A and 4A

In Racketeering Acts 3 and 4, Ganim is alleged to have corruptly accepted cash, merchandise, meals, entertainment and other things of value from Grimaldi and Pinto in exchange for awarding municipal contracts to design and construct a baseball stadium and hockey arena. Paragraph 8(c) of the indictment contains a list of twenty-one items or services allegedly provided in this regard, including clothing, appliances and home furnishings, and legal and architectural services. The mailings that constitute the basis of these acts are two credit card statements (in the name of Joseph Kasper) (Racketeering Acts 3A and 4A) and two agreements between Harbor Communications and C.R. Klewin regarding the provision of marketing services with regard to the baseball stadium and hockey arena (Racketeering Acts 3B and 4B). Only the credit card statements are claimed by Ganim to be insufficiently in furtherance of the scheme.

Ganim, relying on *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) and *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), asserts that the credit card statements are not "in furtherance" of the alleged scheme because the routine mailing of credit card statements does not satisfy the mail fraud statute. Specifically, Ganim contends that the indictment fails to allege any direct connection between the mailings and the alleged schemes, and asserts that the alleged schemes did not depend on the mailings. The Government argues that at trial, the evidence will show that Grimaldi and Pinto paid for many of the meals, entertainment and gifts with their credit cards, and that they subsequently received statements from their credit card companies that were an essential and foreseeable part of this fraudulent scheme.

In *Maze*, the defendant stole his roommate's credit card and used it to pay for hotel rooms during a cross-country trip. The hotels delivered, by mail, the receipts to the card issuer, and the card issuer then mailed monthly statements to the roommate/victim. On this basis, Maze was charged with and convicted of mail fraud. The Supreme Court, affirming the Sixth Circuit's reversal of conviction, held that "the mailings here were directed to the end of adjusting accounts between the motel proprietor, the [card issuer], and [the roommate/victim], all of whom had to a greater or lesser degree been the victims of [Maze's] scheme." 414 U.S. at 402, 94 S.Ct. 645. The Supreme Court concluded that the mailings were thus not "in furtherance" of the scheme.

In *Parr*, the defendants misappropriated government funds by, *inter alia*, using a gasoline credit card issued to the school district to obtain products for their own use. After furnishing products to the defendants, the oil company mailed an invoice to the school district for payment, and the district mailed a check in return. Relying on *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), the Court reversed the mail fraud convictions stemming from this credit card use because the mailings in question were not sufficiently in furtherance of the scheme:

> [T]he scheme ... had reached fruition when [defendants] received the goods and services complained of. The persons intended to receive the goods and services had received them irrevocably. It was immaterial to them, or to any consummation of the scheme, how the oil

company would collect from the District. It cannot be said that the mailings in question were for the purpose of executing the scheme, as the statute requires. *Parr,* 363 U.S. at 393, 80 S.Ct. 1171 (*citing Kann,* 323 U.S. at 94, 65 S.Ct. 148) (alterations and quotations omitted).

The Government relies principally on two cases in support of its contention that the mailing of credit card statements that reflect charges made in furtherance of a scheme can constitute mail fraud: *United States v. Woodward,* 149 F.3d 46 (1st Cir. 1998) and *United States v. Wallach,* 935 F.2d 445 (2d Cir.1991). In *Woodward,* a Massachusetts legislator was charged with mail fraud on the basis of credit card statements mailed to a lobbyist (Sawyer), as the credit card statements reflected charges made by Sawyer for illegal gratuities. The court held that the monthly statements were in furtherance of the scheme:

> In the present case, the mailing in question was sent by Citibank Visa to Sawyer, billing him for charges arising from Sawyer's use of his Visa card to pay for illegal gratuities given to Woodward. According to Woodward, because the mailing took place some three to four weeks after Sawyer purchased the meals and entertainment for Woodward, the use of the mail was "a result of" the fraudulent scheme but not "for the purpose of executing" the scheme. We disagree.
>
> Woodward's argument focuses too narrowly, on each gratuity individually. His contention assumes a new fraudulent scheme began and ended every time Sawyer used his credit card to pick up the tab for Woodward. On the contrary, the evidence supported the conclusion that the fraudulent scheme in which Woodward and Sawyer participated was an ongoing scheme, lasting for years and

involving Sawyer's use of his credit card. Every month, Visa would use the mails to bill Sawyer for his charges; if Sawyer did not pay those bills, his credit line would have been terminated and the gratuities could not have continued as Woodward and Sawyer expected. It was thus a necessary part of the ongoing scheme that Sawyer pay his bill after receiving it in the mail. This case is therefore distinguishable from *Maze* where the mailing involved only a post-fraud accounting among victims, after the defendant's fraudulent use of credit cards was already completed.

149 F.3d at 65 (citations and footnote omitted).

In *Wallach,* a defendant (Chinn) had a secret agreement with his employer whereby he was permitted to spend up to $100,000 annually on personal expenses using the company credit card. Chinn was charged with mail fraud based on the monthly mailing of credit card statements. The Second Circuit affirmed his conviction, noting the centrality of the credit cards to the scheme:

> [U]nder the government's theory the credit card billings were central to the scheme and essential to its continued success. This was not to be a "one shot" proposition. Rather, the intention of the scheme was to enhance Chinn's compensation by paying him periodically for personal expenses he incurred.... Therefore, unlike the situations in *Parr* and *Maze,* the credit card billings were not only anticipated by Chinn, but were also *essential to the success of the scheme....* Absent the regular credit card company mailings, Wedtech could not have treated these payments as reimbursements for business expenses and Chinn's ability to continue to receive the payments would have come to an end.

935 F.2d at 465 (emphasis added; internal citations omitted).

■ *Parr*, Maze, *Woodward* and *Wallach* demonstrate that the question of whether the subsequent mailing of a credit card statement reflecting illicit charges can be the basis of a mail fraud charge is a fact-based inquiry properly answered only after the Government's proof has been adduced. While Ganim contends that nothing about the credit card statements is essential to the alleged scheme, the indictment plainly alleges to the contrary. As the case law demonstrates, there are times when such statements are mailed in furtherance of a scheme (*e.g., Woodward* and *Wallach*) and times when they are not (*e.g., Parr* and *Maze*). The success or failure of the Government's evidence to show an actual nexus between the statements and the scheme will be determined at trial. A pretrial motion to dismiss is not the proper vehicle for testing the Government's proof on this issue.

## C. Racketeering Act 5B

In Racketeering Act 5, Ganim is alleged to have fraudulently caused the expenditure of municipal funds to purchase a million dollar life insurance policy and thereafter "knowingly possessed and maintained" that policy until March 1, 2001, ¶ 76. Ganim allegedly directed Frank Sullivan, a financial consultant, to underwrite the policy, and the Bridgeport Director of Finance to issue a check to the insurance company. The mailings alleged to constitute mail fraud are a statement from the insurance company confirming payment of the premium, and a quarterly report issued by the insurance company.

■ Ganim challenges the second mailing (the quarterly report) as not in furtherance of the alleged scheme, asserting that the alleged fraud was complete when the city council authorized expenditure of the funds. Ganim argues that because the quarterly report was mailed a year after the expenditure was approved, it cannot be in furtherance of the alleged scheme. The Government claims that its evidence will show that the policy had not been paid in full, and that the quarterly reports summarized the financial information pertaining to the policy, including the amount of premiums paid as of the date of the report, in furtherance of the scheme. The adequacy of the Government's evidence will thus await determination at trial.

In short, because the indictment alleges that the scheme included the continued possession and maintenance of the policy, ¶ 76, and inasmuch as a statement showing the amount of premiums yet to be paid on a policy that was not yet paid in full could be proved to be in furtherance of a scheme to defraud the city into procuring the policy, Ganim's argument that the mailing of a quarterly report cannot be in furtherance of the scheme is unavailing at this stage.

## V. RICO

In Count One, Ganim is charged with violating the section of RICO that provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

The indictment alleges that Ganim, a "person," was associated with an enterprise consisting of himself, the Office of the Mayor, Pinto, Grimaldi and unnamed others, and that this group constituted "a

group of individuals and entities associated in fact, the activities of which affected interstate commerce." ¶ 6. The indictment alleges that the enterprise was an ongoing organization functioning as a continuing unit for the purposes of achieving the objectives set out in the indictment, and that Ganim "participated in the operation and management of the enterprise, *inter alia,* by directing other members of the enterprise in carrying out unlawful and other activities in furtherance of the conduct of the enterprise's affairs." *Id.* The indictment sets out the objectives of the enterprise as "the personal, pecuniary and political benefit of members of and persons associated with the enterprise." ¶ 7. It then proceeds to allege eleven racketeering acts (also referred to as "predicate acts"), which are alleged to violate statutes listed in 18 U.S.C. § 1961(1), as the "manner and means of the enterprise." ¶ 8.

 "In order to secure a conviction under RICO, the Government must prove *both* the existence of an 'enterprise' and the connected 'pattern of activity.'" *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (emphasis added). "The enterprise is an entity, [while t]he pattern of racketeering activity is ... a series of criminal acts as defined by the statute." *Id.* (*citing* 18 U.S.C. § 1961(1)). Here, the indictment has set out a distinct enterprise, which is alleged to have been an association in fact of Ganim, the Office of the Mayor, Pinto, Grimaldi and others, that had a hierarchy, ¶ 6 ("Defendant Ganim participated in the operation and *management* of the enterprise ...) (emphasis added), and that had an independent objective, ¶ 7. Next, the indictment has set out a pattern of racketeering activity that is composed of separate racketeering acts.

Relying on *United States v. McClendon,* 712 F.Supp. 723 (E.D.Ark.1988), Ganim argues that the indictment is defective "because it fails to allege an ongoing structure or hierarchy that is separate and distinct from the alleged racketeering acts." Mot. Dismiss at 14. In *McClendon,* the court dismissed an indictment that "allege[d] no purpose for the alleged enterprise other than carrying out the illegal scheme," *id.* at 727, because the Government failed to allege that the enterprise "existed in order to maintain operations towards an economic goal separate from the commission of the alleged predicate acts making up the pattern or racketeering activity," *id.* *McClendon* relies on *United States v. Anderson,* 626 F.2d 1358 (8th Cir.1980), and other Eighth Circuit cases reiterating this so-called "distinctness" requirement of a RICO enterprise. The Second Circuit, however, has squarely rejected this view. In *United States v. Mazzei,* 700 F.2d 85 (2d Cir.1983), it addressed and rejected by name the Eighth Circuit's holding in Anderson:

> The appellant correctly notes that the Eighth Circuit's position on "distinctness" is at issue with our analysis. *See United States v. Lemm,* 680 F.2d 1193, 1198–1201 (8th Cir.1982); *United States v. Bledsoe,* 674 F.2d 647 (8th Cir.1982); *United States v. Anderson,* 626 F.2d 1358 (8th Cir.1980).... We are not persuaded by that precedent, substantially for the reasons detailed in this opinion.

*Id.* at 89.

 The case law thus makes clear that there is no distinctness requirement in this Circuit. While the Government must prove both an enterprise and a pattern of racketeering activity, "proof of these separate elements [need not] be distinct and independent, as long as the proof offered is sufficient to satisfy both elements." *Id.* Here, as set out above, the Government has alleged in the indictment that an enterprise existed and functioned,

setting out the members, structure and goals of the enterprise. While Ganim asserts that there are "no allegations to establish that the alleged association-in-fact enterprise was anything more than a group of people who committed various predicate acts not always in concert and, on at least one occasion, to the financial detriment of at least one of the members of the alleged enterprise," Mot. Dismiss at 16, this argument ignores paragraphs six through eight of the indictment, which, as set out above, plainly allege more than the disconnected commission of unrelated predicate acts. While Ganim is free to argue after conclusion of the Government's case in chief that it has failed to prove the existence of an enterprise as required by the statute and interpretive case law, such arguments are premature as a basis for a motion to dismiss, which can test only the legal sufficiency of the indictment rather than the sufficiency of its factual support.

## VI. Constitutionality of 18 U.S.C. § 666

Three counts of the indictment charge Ganim with violating the federal-program bribery statute, 18 U.S.C. § 666, which provides in pertinent part:

> Whoever if the circumstance described in subsection (b) of this section exists— (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—(i) is valued at $5,000 or more, and (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; or (B) corruptly solicits or de-

mands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more; or (2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more; shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 666(a). The "circumstance" is that "the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(b).

In a supplement to his original motion to dismiss the indictment, Ganim expands upon an earlier argument and seeks the dismissal of those counts of the indictment alleging violations of this statute, arguing that the statute exceeds Congress's power under the Spending Clause [19] and is thus facially unconstitutional. He relies on *United States v. Morgan*, 230 F.3d 1067 (8th Cir.2000) (Bye, J., specially concurring), and *United States v. Sabri*, 183 F.Supp.2d 1145 (D.Minn.2002), both of which determined that § 666 was not a constitutional exercise of Congressional authority. Alternatively, he argues that

---

**19.** U.S. Const. art. I, § 8, cl. 1. ("The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . .").

these counts are factually defective because "there is no apparent connection between the alleged bribes and the integrity of any federal program because either (i) there were no federal funds involved or, (ii) to the extent limited federal money was involved, there was no nexus between the alleged bribes and the integrity of the program." Supp.Mem. [Doc. # 66] at 7 n. 2.

The Government notes that under the Second Circuit's limitation of the statute in *United States v. Santopietro*, 166 F.3d 88 (2d Cir.1999), the Government is required to prove "some connection between the bribe and a risk to the integrity of the federal[ly] funded program." *Id.* at 93. The Government also relies on *Salinas v. United States*, 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), in which the Supreme Court held that the statute was constitutionally applied to a sheriff who accorded preferential treatment to an inmate in a jail operated under a series of agreements with the federal government, because this treatment was "a threat to the integrity and proper operation of the federal program." *Id.* at 61, 118 S.Ct. 469. Since "[a] facial challenge ... must establish that no set of circumstances exists under which the Act would be valid[,]" *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), the Government posits that the Supreme Court's holding in *Salinas* forecloses any claim that the statute is unconstitutional on its face. Finally, the Government argues that at trial, it "is prepared to establish a connection between the transactions sought to be influenced and the city's receipt of federal funds," Govt's Opp. [Doc. # 67] at 6, and that dismissal of the § 666 counts is thus inappropriate at this stage.

■ The cases upon which Ganim relies are expressly critical of *Santopietro's* imposition of a nexus requirement between

the bribery and a risk to the integrity of a federally-funded program, but *Santopietro* remains the controlling law in this Circuit. While Ganim argues that "[t]he respective courts in *Salinas* and *Santopietro* were not asked to address the facial constitutionality of § 666 [and neither case] contains any discussion regarding Congress' authority under the Spending Clause when enacting § 666," Mem.Supp. [Doc. # 66] at 7, he overlooks that *Salinas* explicitly held that "the application of § 666(a)(1)(B) to Salinas did not extend federal power beyond its proper bounds," 522 U.S. at 61, 118 S.Ct. 469, on which *Santopietro* relied in holding:

The evidence also satisfies the requirement of *Foley*, undisturbed by *Salinas*, that the transaction sought to be influenced had some connection with a federal program. Indeed, *Salinas* may be read to indicate that the "threat to the integrity and proper operation of [a] federal program" created by the corrupt activity is necessary to assure that the statute is not unconstitutionally applied.

166 F.3d at 93 (*citing United States v. Foley*, 73 F.3d 484, 493 (2d Cir.1996) and *Salinas*, 522 U.S. at 60–61, 118 S.Ct. 469). Defendant's argument that § 666 is facially unconstitutional is belied by controlling authority in this Circuit, and is therefore rejected.

■ Defendant's alternative claim that "there is no apparent connection" between the bribes and the integrity of the federally-funded programs must be rejected at this stage, as the indictment's allegations are adequate. In *Santopietro*, the court found the following allegations in the indictment to suffice:

[C]orrupt payments were made by real estate developers to secure the use of the appellants' influence with city agencies "including the City Plan Commission, the Zoning Commission, the Water

Department, and the Fire Marshal," Indictment P 21, and the use of their influence to further the interests of the developers "in the appointments of members and chairpersons of land use boards and relevant committees and agencies in the City of Waterbury," *id.* P 25. During the relevant periods, substantial federal funds were received by Waterbury for housing, urban development, and other programs within the purview of these agencies and officials. Since federal funds were received by Waterbury for housing and urban development programs and the corrupt payments concerned real estate transactions within the purview of the agencies administering federal funds, the requisite connection between the bribes and the integrity of federally funded programs is satisfied.

166 F.3d at 93. Here, the indictment alleges that Bridgeport received federal funds "administered, *inter alia,* by the Office of Planning and Economic Development, the Office of Public Facilities and the Bridgeport Water Pollution Control Authority ("WPCA")." ¶ 1. The indictment alleges that Ganim "us[ed] his influence with city agencies, including ... the Office of Planning and Economic Development, the Office of Public Facilities and the WPCA for the benefit of" the individuals and corporations who allegedly bribed him. ¶ 7. Inasmuch as "the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment," *United States v. Alfonso,* 143 F.3d 772, 776–777 (2d Cir.1998), evaluation of the sufficiency of the Government's proof on connectedness must await trial.

VII. Conclusion

For the reasons set out above, the Court's ruling [Doc. # 39] denying Ganim's motion [Doc. # 26] for a bill of particulars is VACATED, and upon reconsideration the motion is GRANTED as to ¶¶ 8(a) –(c) of the motion, with the requested information to be provided as to each benefit (whether actual or constructive) that Ganim is alleged to have received, solicited or otherwise procured or attempted to procure in connection with the pending charges. The bill of particulars motion is denied in all other respects. Ganim's motion to dismiss the indictment [Doc. # 50] is DENIED.

IT IS SO ORDERED.