03-1448-cr
USA v. Ganim

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2006

(Argued: June 15, 2007                    Decided: December 4, 2007)

Docket No. 03-1448-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

JOSEPH P. GANIM,

*Defendant-Appellant.*

_____

Before JACOBS, *Chief Judge*,
SOTOMAYOR and WESLEY, *Circuit Judges*.

_____

Defendant-Appellant Joseph Ganim ("Ganim"), the former mayor of Bridgeport, Connecticut, appeals from the judgment of the United States District Court for the District of Connecticut, convicting him, after a jury trial, of racketeering in violation of 18 U.S.C. § 1962(c); racketeering conspiracy in violation of 18 U.S.C. § 1962(d); extortion in violation of 18 U.S.C. § 1951; honest services mail fraud in violation of 18 U.S.C. §§ 1341 & 1346; bribery involving programs receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B); conspiracy to commit bribery in violation of 18 U.S.C. § 371; and filing false income tax returns in violation of 26 U.S.C. § 7206(1). In this opinion, we reject Ganim's claim that the jury instructions on the bribery-related offenses were erroneous, and hold that the government was not required to prove a direct link between a benefit Ganim received and a specific act he performed, so long as the government proved that Ganim received benefits in exchange for his agreement to perform specific official acts or to do so as the opportunities arose. We AFFIRM the judgment below.

SANDRA S. GLOVER, Assistant United States
Attorney (Ronald S. Apter, Special Assistant United
States Attorney, William J. Nardini, Assistant
United States Attorney, *on the brief*), *for* Kevin J.
O'Connor, United States Attorney for the District of

Connecticut, New Haven, Connecticut, *for Appellee*.

ERIC W. BLOOM, Winston & Strawn LLP, Washington, D.C. (Peter Goldberger, Pamela A. Wilk, Alan Ellis, Law Offices of Alan Ellis, Ardmore, Pennsylvania, Edwin H. Caldie, Winston & Strawn LLP, Washington, D.C., *on the brief*), *for Defendant-Appellant*.

SOTOMAYOR, *Circuit Judge*:

Defendant-appellant Joseph P. Ganim ("Ganim"), the former mayor of Bridgeport, Connecticut, appeals from the judgment of the United States District Court for the District of Connecticut (Arterton, J.). Ganim was convicted, after a jury trial, of racketeering in violation of 18 U.S.C. § 1962(c); racketeering conspiracy in violation of 18 U.S.C. § 1962(d); extortion in violation of 18 U.S.C. § 1951; honest services mail fraud in violation of 18 U.S.C. §§ 1341 & 1346; bribery involving programs receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B); conspiracy to commit bribery in violation of 18 U.S.C. § 371; and filing false income tax returns in violation of 26 U.S.C. § 7206(1). Ganim was sentenced principally to 108 months' imprisonment for his offenses.

On appeal, Ganim contends that in order to prove his guilt (on all but the tax crimes), the government was required to link each alleged benefit Ganim received to a specific official act he performed.[1] We hold that the government was not required to allege or to prove that type of

---

[1] Ganim advances no argument—save a conclusory one in a footnote of his reply brief—why his conviction on the tax crimes (Counts 22 and 23) would be affected by his arguments concerning the bribery-related crimes. We decline to consider his belated and buried argument, *see United States v. Gabriel*, 125 F.3d 89, 100 n.6 (2d Cir. 1997), *abrogated on other grounds by Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005), *as recognized in United States v. Quattrone*, 441 F.3d 153, 176, 180 n.28 (2d Cir. 2006), and note only that the tax crimes for which he was convicted do not depend on whether the income he failed to report was obtained

direct link, and conclude that the jury was properly charged on the law. In a separate summary order filed today, we reject Ganim's other challenges to his conviction and sentence, and hold that: (1) the indictment and bills of particular sufficiently informed Ganim of the charges against him; (2) the prosecutor's closing remarks did not amount to misconduct warranting reversal; (3) the district court did not err in declining to recess jury deliberations after a juror reported that she may have been fired from her job; and (4) Ganim's resentencing process under *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005) was constitutional and his sentence was reasonable. We AFFIRM the judgment below.

## BACKGROUND

### I.      Offense Conduct[2]

Ganim served as the mayor of Bridgeport, Connecticut (the "City") from 1991 through the time of his conviction in 2003. As mayor, Ganim was responsible for the overall operation of municipal government and, among other responsibilities, had final authority over the City's contracts. During his first campaign for mayor, Ganim became acquainted with Leonard J. Grimaldi ("Grimaldi"), who acted as a media advisor, and Paul J. Pinto ("Pinto"), who began as his driver and aide. Ganim developed close relationships with Grimaldi and Pinto over the years that followed. Grimaldi subsequently formed a public relations company called Harbor Communications, of which he was the sole proprietor and employee. Pinto became associated

legally or not.

[2] The following account of Ganim's criminal conduct is drawn from the evidence the prosecution adduced at trial, primarily the testimony of the cooperating witnesses Leonard J. Grimaldi and Paul J. Pinto, presented in the light most favorable to the guilty verdict. *See United States v. Males*, 459 F.3d 154, 155 (2d Cir. 2006).

3

with (and later purchased an ownership interest in) the Kasper Group, a Bridgeport architecture and engineering firm.

### A.     PSG Contract Bid

In 1995 and 1996, Bridgeport was considering privatizing its wastewater treatment facilities. Ganim suggested that Grimaldi contact Professional Services Group ("PSG") to act as PSG's public relations consultant in connection with its bid for the water treatment contract. Grimaldi then contacted PSG, which retained him as a consultant for a fee of $30,000. PSG submitted a proposal for the contract, as did U.S. Water, a competing firm which was represented by Pinto and by United Properties. The owners of United Properties, Albert Lenoci, Sr. and Albert Lenoci, Jr. (the "Lenocis"), were Ganim's political benefactors.

After the bids were submitted, Ganim told Pinto that he had decided to award the contract to PSG, but that Pinto should arrange a financial deal between PSG and United Properties because Ganim did not want to choose between big supporters. Ganim told Pinto that "[i]f they want the deal, they'll do it." In turn, Pinto explained to Grimaldi that if PSG wanted to win the contract, it would have to "take care of the Lenocis." Grimaldi acquiesced, as did PSG upon his advice. PSG agreed to pay Grimaldi $70,000 more per year for the contract's duration, which he was to pass on to Pinto and the Lenocis. Pinto informed Ganim of the deal, and Ganim approved the selection of PSG to operate the wastewater treatment facilities.

Between May 1997 and April 1999, PSG paid Grimaldi roughly $311,396 in consulting fees, much but not all of which Grimaldi paid to Pinto. Grimaldi and Pinto used some portion of this money to provide Ganim benefits such as entertainment, meals and clothing.

4

### B. Fifty-Fifty Fee Sharing Agreement

In December 1996, Ganim traveled with Pinto and Grimaldi to Tucson, Arizona. During the trip, Ganim told them they should "join forces" by agreeing to split any consulting fees they earned through future dealings with the City, and that Ganim would steer contracts to the pair, in return for which they would "tak[e] care of" his expenses and needs. Upon returning to Bridgeport, the three men met to confirm the agreement. Grimaldi testified that during that meeting, he and Pinto agreed that:

> a portion of that money [from the agreement] would be to take care of [Ganim]. If he needed cash, we would take care of him. If he needed suits, we'd take care of him. If he needed shirts, we'd take care of him. Any needs that he required, off of that 50/50 arrangement, we would take care of [Ganim]. In exchange for that, [Ganim] would make sure that all of our clients would get work from the city if they wanted it, that he would steer city contracts and jobs to our clients . . . .

Pursuant to the fee sharing agreement, Ganim steered certain projects (some of which are discussed below) to Pinto's and Grimaldi's clients from February 1997 to April 1999. Meanwhile, Grimaldi and Pinto provided Ganim with cash, meals, fitness equipment, designer clothing, wine, jewelry and other items. Also at around that time, Grimaldi employed Ganim's wife. At Ganim's insistence, Grimaldi overpaid her, gave her payments in cash and did not report her income to the Internal Revenue Service.

### C. Bridgeport Energy-Funded Programs

In 1998, Ganim had Grimaldi arrange for Bridgeport Energy—one of Grimaldi's clients —to contribute one million dollars to fund a promotional advertising campaign and the City's "Clean & Green" program, which demolished and rehabilitated blighted properties. Ganim then arranged for Grimaldi to oversee the advertising campaign and for one of the Lenocis' firms,

represented by Pinto, to administer the Clean & Green monies. Pursuant to the fee-sharing agreement, Grimaldi and Pinto used a portion of their consulting fees for these programs to benefit Ganim.

### D. PSG Contract Extension & One-Third-Each Fee Sharing

In late 1998, PSG sought a long-term extension of its contract to operate the City's wastewater treatment facilities. In a meeting with Grimaldi and Pinto, Ganim told Grimaldi that he would support the contract extension. In exchange, Grimaldi was to renegotiate his contract with PSG to get more of his consulting fees up front. Ganim also directed that the three men would split those fees—as well as fees from all future deals with the City—one-third each. Grimaldi was to pay Ganim's share to Pinto, who would hold the fees for Ganim. Following these discussions, Grimaldi successfully renegotiated his consulting fees with PSG, such that he was paid $495,000 in a front-loaded deal. On May 27, 1999, Ganim awarded PSG the contract extension. Over several weeks Grimaldi paid Pinto roughly two-thirds of the consulting fee, one third of which was for Ganim. Pinto kept Ganim's share mixed with his own money to avoid detection.

Throughout most of 1999, Grimaldi and Pinto provided Ganim—upon his request—with money and benefits such as wine, cabinets, home improvements and meals. Pinto stated at trial that "I was holding [Ganim's] money. When he needed the money, I'd give it to him or use it the way he directed me to . . . ."

In September 1999, Ganim and Grimaldi had a "falling out," and eventually Grimaldi stopped paying Ganim's portion of the money to Pinto. From that point forward, Ganim shunned Grimaldi and prevented his clients from obtaining contracts with the City.

6

### E. Life Insurance Policy

In early 1999, Ganim sought to use City funds to purchase a one-million-dollar life insurance policy for himself, as well as for certain City department heads as "cover." He approached Frank Sullivan ("Sullivan"), a childhood friend who had become a stockbroker, about brokering the deal. Ganim approved the purchase of the policies in April 1999 without the City Council's approval. After the purchase of the policies was leaked to the media, Ganim wrote to The Hartford Life Insurance Company to request that his own policy be terminated, but did not fill out the appropriate paperwork so that the policy would remain in effect. At the end of the fiscal year, Ganim had the funding for the policies inserted as one of many summary budget transfers, which were approved by the City Council.

Sullivan received a $17,500 commission for serving as the broker for Ganim's policy. Acting on behalf of Ganim, Pinto advised Sullivan that if Sullivan wanted to do more business with the City, he would have to pay a kickback. Sullivan subsequently paid $5,000 in cash for Ganim and Pinto to share.

### F. Pension Plans

In the fall of 1999, Sullivan sought to become the broker of record for two municipal pension plans, "Plan A" and "Plan B." Ganim had Pinto tell Sullivan that if he wanted the position, Sullivan would have to give fifty percent of his commissions to Ganim and Pinto. With Ganim's support, Sullivan was appointed as the broker for the Plan B pension in September 1999. The following year, and again with Ganim's support, the Director of Finance for the City of Bridgeport retained Sullivan's investment firm to assist the city in underwriting the Plan A pension. Sullivan received $38,000 as the first installment of his brokerage commission, which

7

he intended to split with Pinto and Ganim. They did not request their respective cuts, however, as they had become anxious about the pending federal investigation against them.

### G. Juvenile Detention Facility

In early 1999, the City, pursuant to a State of Connecticut project, was attempting to condemn property owned by B.C. Sand & Gravel in order to build a juvenile detention facility. B.C. Sand & Gravel retained Pinto, agreeing to pay him $100,000 if he successfully stopped the condemnation. Pinto informed Ganim of the agreement, who then exercised his influence to change the City's position on the condemnation. The State ultimately abandoned the project, and, as a result, Pinto received his fee from B.C. Sand & Gravel. Pinto held half of that fee for Ganim's benefit pursuant to their usual fee sharing arrangement, and from that sum provided Ganim with cash and benefits upon his request.

### H. United Properties & Dollar-A-Square-Foot

The Lenocis, principals of United Properties, were seeking in 1998 and 1999 to develop tracts of land in the City, including a site called Father Panik and another called Steel Point. The Lenocis and Pinto worked out a deal whereby United Properties would pay Pinto one dollar for each square foot of space they constructed in the City in the future. Pinto was to use some of that money to "take care of" Ganim, who in turn lobbied to get the Lenocis a long-term lease to develop Father Panik. In 2000, the City sought bids to develop Steel Point. In a November 2000 meeting with Pinto and Ganim, the Lenocis promised to raise $500,000 for Ganim's anticipated gubernatorial campaign in exchange for his commitment to get them the Steel Point project. But the Lenocis did not bid on the project when federal search warrants were executed at United Properties. Because neither the Father Panik nor the Steel Point projects materialized, Ganim

8

and Pinto received no money in connection with these projects.

### I. False Income Tax Returns

On his 1998 and 1999 income tax returns, Ganim failed to report as income $47,996 and $265,733, respectively, in cash and benefits provided by Pinto and Grimaldi, including the sums Grimaldi paid to Ganim's wife.

### J. Ganim's Defense

Ganim testified in his own defense at trial. He acknowledged that Pinto and Grimaldi provided him with cash, meals, clothing, wine and other gifts, but claimed they did so out of friendship or legitimate lobbying activity. He denied receiving any gifts in exchange for official acts, denied entering any fee-sharing agreement with Pinto and Grimaldi, denied being "partners" with them or being aware of the deals between Pinto and Grimaldi, and claimed that he acted only in the best interest of the City.

Ganim confirmed that his wife had worked for Grimaldi, but claimed that their failure to report her wages was inadvertent. He also admitted acquiring a life insurance policy paid for by City funds but denied having purchased it secretly or without proper City Council authorization.

## II. Judicial Proceedings

### A. Indictment

Between 1997 and 2001, the Federal Bureau of Investigation and the Internal Revenue Service conducted an investigation of municipal corruption in the City. On October 31, 2001, a grand jury in the United States District Court for the District of Connecticut returned a twenty-four count indictment against Ganim, and on March 27, 2002, the grand jury returned a superseding indictment containing the same charges.

9

Count 1 alleged that Ganim, along with Pinto and Grimaldi, conducted a racketeering enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) ("RICO"), and listed eleven predicate racketeering acts. Count 2 alleged conspiracy to conduct a racketeering enterprise. Counts 3-21, which overlapped with many of the predicate RICO acts, were separately charged as the following crimes: (1) extortion in violation of the Hobbs Act, 18 U.S.C. §§ 1951 & 1952; (2) mail fraud in violation of 18 U.S.C. §§ 1341 & 1346; (3) bribery involving programs receiving federal funds ("federal programs bribery") in violation of 18 U.S.C. § 666; and (4) conspiracy under 18 U.S.C. § 371 to commit bribery under 18 U.S.C. § 666. Counts 22 and 23 alleged the filing of false tax returns in violation of 28 U.S.C. § 7206(1). Count 24 was a forfeiture count under 18 U.S.C. § 1963.

The district court granted Ganim's motion for a bill of particulars, ordering the government to provide "a limited bill" "setting out the specific benefits Ganim is alleged to have received." *United States v. Ganim*, 225 F. Supp. 2d 145, 148, 155 (D. Conn. 2002). After receiving the bill of particulars, Ganim moved for a supplemental bill on the grounds that the first was incomplete. The district court granted the motion, and the government subsequently filed a supplemental bill.

### B. The Trial and Verdict

Ganim's trial commenced on January 8, 2003, and lasted ten weeks. Before the case was submitted to the jury, Counts 18 and 21 of the indictment were dismissed for reasons not relevant here. After deliberating for eight days, the jury returned a verdict convicting Ganim on 16 of the remaining 22 counts.

### C.    Sentencing

On July 1, 2003, the district court sentenced Ganim principally to nine years' imprisonment, the top of the 87-108 months Sentencing Guidelines range, followed by a three-year term of supervised release. The court also imposed a fine upon Ganim in the sum of $150,000, ordered him to pay restitution to Bridgeport Energy and to the City in the total amount of $148,617, and ordered Ganim to forfeit $175,000 in proceeds derived from the racketeering enterprise.

Ganim timely appealed, but before briefing was complete, the Supreme Court issued its decision in *United States v. Booker*, 543 U.S. 220 (2005), and this Court issued its decision in *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Pursuant to *Crosby*, this Court remanded Ganim's case to the district court. The district court rejected Ganim's request for resentencing, concluding that it would not have imposed a materially different sentence under an advisory guidelines regime. *United States v. Ganim*, 01 Cr. 263 (JDA), 2006 WL 1210984, at * 3 (D. Conn. May 5, 2006). Our jurisdiction was reinstated when Ganim notified this Court of the district court's decision.

### DISCUSSION

Ganim challenges the jury charges given on the bribery-related crimes at issue: (1) extortion in violation of the Hobbs Act, 18 U.S.C. § 1951; (2) "honest services mail fraud" in violation of 18 U.S.C. §§ 1341 & 1346; (3) federal programs bribery in violation of 18 U.S.C. § 666(a)(1)(b); and (4) bribe receiving in violation of Connecticut General Statutes section 53a-148[3] (collectively, the "bribery-related crimes"). As explained further below, each of these

---

[3] This Connecticut statute served as the basis for some of the RICO predicate offenses.

statutes criminalizes, in some respect, a quid pro quo agreemen—to wit, a government official's receipt of a benefit in exchange for an act he has performed, or promised to perform, in the exercise of his official authority. Ganim's challenges to the jury charge primarily relate to a single issue: namely, whether proof of a government official's promise to perform a future, but unspecified, official act[4] is sufficient to demonstrate the requisite quid pro quo for a conviction. Ganim essentially claims that at the time a quid pro quo agreement is reached, a direct link must exist between a benefit received and a specifically identified official act. We disagree, and hold that the requisite quid pro quo for the crimes at issue may be satisfied upon a showing that a government official received a benefit in exchange for his promise to perform official acts or to perform such acts as the opportunities arise.

## A.      Standard of Review

"We review jury charges *de novo*, reversing only where a charge either failed to inform the jury adequately of the law or misled the jury about the correct legal rule." *United States v. Ford*, 435 F.3d 204, 209-10 (2d Cir. 2006) (internal citation omitted). No particular form of words is required, so long as "taken as a whole" the instructions correctly convey the required legal principles. *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). Moreover, this Court does "not review portions of the instructions in isolation, but rather consider[s] them in their entirety to determine whether, on the whole, they provided the jury with an intelligible and accurate portrayal of the applicable law." *United States v. Weintraub*, 273 F.3d 139, 151 (2d Cir. 2001).

---

[4] Except where otherwise noted herein, we use the term "official act" in a general sense to mean an act taken under color of official authority, not necessarily as the term is used and statutorily defined in 18 U.S.C. § 201 or elsewhere.

**B.      Hobbs Act Extortion**

**1.       Relevant Law**

The Hobbs Act makes it a crime to "obstruct[], delay[], or affect[] commerce or the

movement of any article or commodity in commerce, by robbery or extortion," and defines

extortion as "the obtaining of property from another, with his consent, induced by wrongful use

of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C.

§ 1951(a), (b)(2).  Ganim challenges his conviction for extortion "under color of official right."

In *McCormick v. United States*, 500 U.S. 257 (1991), the Supreme Court considered the

requirements for an extortion conviction under color of official right in the special context of

campaign contributions.  The Court held:

> The receipt of such contributions is . . . vulnerable under the Act as having been
> taken under color of official right, but only if the payments are made *in return for an*
> *explicit promise or undertaking by the official to perform or not to perform an*
> *official act*. In such situations the official asserts that his official conduct will be
> controlled by the terms of the promise or undertaking.

*Id.* at 273 (emphasis added).  That is, proof of an express promise is necessary when the

payments are made in the form of campaign contributions.  *Id.* at 273-74.  The Court, however,

explicitly did "not decide whether a quid pro quo requirement exists in other contexts, such as

when an elected official receives gifts, meals, travel expenses, or other items of value."  *Id.* at

274 n.10.

In *Evans v. United States*, 504 U.S. 255 (1992), the Court held that an affirmative act of

inducement by a public official is not an element of the offense of extortion under color of

official right.  *Id.* at 257, 268.  The Court also found that the jury instruction, which allowed for a

conviction if the official accepted money "in exchange for [a] specific requested exercise of his

13

or her official power," satisfied *McCormick*'s quid pro quo requirement. *Id.* at 258, 267. The Court explained that "the offense [of extortion] is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the quid pro quo is not an element of the offense." *Id.* at 268. Thus, the Court concluded, the government "need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Id.*

We harmonized *McCormick* and *Evans* in *United States v. Garcia*, 992 F.2d 409 (2d Cir. 1993), stating:

> Although the *McCormick* Court had ruled that extortion under color of official right in circumstances involving campaign contributions occurs "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act," *Evans* modified this standard in non-campaign contribution cases by requiring that the government show only "that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."

*Garcia*, 992 F.2d at 414 (internal citations omitted). Drawing from Justice Kennedy's concurrence in *Evans*, we found that a quid pro quo was required to sustain a conviction in the non-campaign context, but that the agreement may be implied from the official's words and actions because "'otherwise the law's effect could be frustrated by knowing winks and nods.'" *Id.* (quoting *Evans*, 504 U.S. at 274 (Kennedy, J., concurring)).

The facts in *Garcia* were similar to the ones now before us. Over the course of several years, then New York Congressman Robert Garcia solicited money and loans from a defense-contractor company, and in exchange steered federal projects to the company and interceded on its behalf with banks and government agencies. The jury instruction, given shortly before the Supreme Court's decision in *Evans*, failed to charge the jury that it must find a quid pro quo to

14

convict. Rather, the district court presented three alternative theories that could sustain a conviction: (1) soliciting money "in connection with" the official's duties; (2) offering to confer a benefit or to take some official action (or inaction) in exchange for money; and (3) accepting money that "could reasonably have affected" the exercise of official duties. *Garcia*, 992 F.2d at 413. We reversed the conviction because only the second alternative presented in the jury charge satisfied the quid pro quo standard articulated in *Evans*. Specifically, we explained that "[a]lthough no explicit agreement between [the company] and Garcia need have been shown, the government must have shown that Garcia received the payment 'knowing that [it] was made in return for official acts." *Id.* at 415 (quoting *Evans*, 504 U.S. at 268) (alternation in original). Thus, we explained, "it was not enough for the jury to have concluded that Garcia's acceptance of money was 'in connection with [his] official duties' or 'reasonably' could have 'affected' the performance of his official duties." *Garcia*, 992 F.2d at 415 (quoting *Evans*, 504 U.S. at 268) (alteration in original). Rather, in order to satisfy the requisite quid pro quo, "[t]he jury was required to find that Garcia understood that the payment was made in return for performance of those duties." *Garcia*, 992 F.2d at 415.

Shortly after *Garcia*, we were called upon again in *United States v. Coyne*, 4 F.3d 100 (2d Cir. 1993), to delineate the contours of the quid pro quo requirement in the context of a jury charge challenge. *Coyne* concerned the conviction of the Albany County Executive for his extortion of a $30,000 "loan" from the owner of a company he had helped to obtain a lucrative city contract. We upheld the following Hobbs Act jury instruction:

> [Y]ou may only find the defendant guilty of this crime if you find that he obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts rather than being given voluntarily or unrelated to the defendant's office. The defendant need not have affirmatively induced the payment

15

by his actions, but he must know the payment is offered in exchange for a specific requested exercise of his official power in order to violate the statute.

*Id.* at 113-14. We found that the instruction "tracked the Supreme Court's statement in *Evans*."

*Id.* at 114. We also explained that "the government does not have to prove an explicit promise to perform a particular act made at the time of payment." *Id.* Instead, "it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence—i.e., on behalf of the payor—as specific opportunities arose." *Id.* (internal citation omitted).

### 2. Jury Charge

In charging the jury on the elements of extortion, the district court explained that the government was required to prove that "the defendant wrongfully used the authority of his office or position to obtain the money, goods or services to which he was not entitled."[5] The court continued:

> To satisfy this element, the government must prove that the defendant obtained a payment to which he was not entitled by use of his office, *knowing that the payment was made in return for official acts rather than being given voluntarily or unrelated to the defendant's official position*. The defendant need not have initiated the payments, but he must have known that the *payment was made in exchange for a specific exercise of the defendant's official powers*. You do not have to determine whether the defendant could or did actually perform the service, or whether he actually had a duty to do so.
>
> The government does not have to prove an explicit promise to perform a particular act made at the time of payment. *It is sufficient if the defendant understood he was expected as a result of the payment to exercise particular kinds of influence, that is, on behalf of the payor, as specific opportunities arose.* (emphasis added)
>
> Both parties appear to agree that the language in the first paragraph—requiring that the

---

[5] The jury was charged on the law of Hobbs Act extortion in connection with Count 1 (racketeering acts 1A and 6), and then again in summary form in connection with Count 3.

16

defendant know "that the payment was made in return for official acts," and "that the payment was made in exchange for a specific exercise of the defendant's official powers"—accurately portrays the applicable quid pro quo standard. Ganim objects, however, to the statement in the second paragraph that "[i]t is sufficient if the defendant understood he was expected as a result of the payment to exercise particular kinds of influence, that is, on behalf of the payor, as specific opportunities arose." He claims that this instruction misled the jury as to what establishes a quid pro quo under the Hobbs Act, because it did not require the jury to find "that any of the benefits received were connected to a 'specific' act."

To the extent Ganim objects to the "particular kinds of influence" phraseology in the second paragraph quoted above from the jury charge, we find no error. Because the preceding paragraph in the charge clearly articulated the "payment . . . in return for official acts" quid pro quo, the phrase "kinds of influence," which might otherwise be ambiguous, would only be understood to refer to undertaking the official acts that made up Ganim's part of the bargain.

Moreover, to the extent Ganim claims that the benefits received must be directly linked to a particular act at the time of agreement, he overstates the law. We explained in *Coyne*, in language mirroring the jury charge here, that "it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence—i.e., on behalf of the payor—as specific opportunities arise." *See Coyne*, 4 F.3d at 114; *see also United States v. Bradley*, 173 F.3d 225, 231-32 (3d Cir. 1999) (upholding Hobbs Act jury instruction containing substantially similar language).[6] Our statement in *Coyne* is a natural corollary of

---

[6] To the extent that our statement in *Coyne* was dicta, insofar as the jury charge did not contain the "as specific opportunities arise" language, we now hold what we stated then.

17

*Evans*' pronouncement that the government need not prove the existence of an explicit agreement at the time a payment is received, *Evans*, 504 U.S. at 268. *See Coyne*, 4 F.3d at 114 (implicitly drawing the connection); *see also Bradley*, 173 F.3d at 231-32 (same). Rather, it is enough that a "public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Evans,* 504 U.S. at 268. Moreover, given that the crime of extortion occurs without regard to whether the promised official act is carried out, *see id.* ("[F]ulfillment of the quid pro quo is not an element of the offense."), Ganim's proposal—that a specific act be identified and directly linked to a benefit at the time the benefit is received—demands too much.

In contending otherwise, Ganim's reliance on *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999), is misplaced. Sun-Diamond was a trade association convicted of providing illegal gratuities under 18 U.S.C. § 201(c)(1)(A) for having given tickets, meals and other items to the Secretary of Agriculture. *Id.* at 401. The indictment "alluded to two matters" "before the Secretary in which [Sun-Diamond] had an interest," but "did not allege a specific connection between either of them—or between any other action of the Secretary—and the gratuities conferred." *Id.* at 401-02. The district court instructed the jury that it could convict Sun-Diamond of giving illegal gratuities if it found that "Sun-Diamond provided [the Secretary] with unauthorized compensation simply because he held public office," and that "[t]he government need not prove that the alleged gratuity was linked to a specific or identifiable official act or any act at all." *Id.* at 403. The issue before the Supreme Court was whether a "conviction under the illegal gratuity statute requires any showing beyond the fact that a gratuity was given because of the recipient's official position." *Id.* at 400. The Court held that the statute

18

did require something more; namely, "a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." *Id.* at 414.  The Court explained that a contrary ruling would not "fit comfortably with the statutory text, which prohibits only gratuities given or received 'for or because of *any official act* performed or to be performed,'" and then defines "official act" as "'any decision or action on any question, matter, cause, suit, proceeding or controversy.'" *Id.* at 406 (alteration in original) (quoting 18 U.S.C. § 201(a)(3), (c)(1)(A)).  The Court also explained that, if an official's position rather than an official's act were sufficient to convict, the line between illegal and legal gift giving would be indiscernible.  *Id.* at 408-11.

Ganim seems to acknowledge, as he must, that *Sun-Diamond*'s holding does not on its face extend to the extortion statute, or to any other of the bribery-related statutes under which he was convicted.  He nonetheless argues that common sense requires us to extend this direct link requirement beyond the gratuities context to the bribery-related crimes at issue.  Otherwise, he contends, the government would be able to convict upon proof of a "less exacting nexus" than it must to demonstrate a gratuities offense, notwithstanding that extortion and bribery are far more serious crimes that carry more severe criminal penalties.  But Ganim's argument misapprehends *Sun-Diamond*.

To begin, there is good reason to limit *Sun-Diamond*'s holding to the statute at issue in that case, as it was the very text of the illegal gratuity statute—"for or because of *any official act*" —that led the Court to its conclusion that a direct nexus was required to sustain a conviction under § 201(c)(1)(A).  *Sun-Diamond*, 526 U.S. at 406 (alternation in original) ("The insistence upon an 'official act,' carefully defined, seems pregnant with the requirement that some

19

particular official act be identified and proved."). Neither the Hobbs Act provision under which Ganim was convicted, 18 U.S.C. § 1951, nor any other of the bribery-related statutes at issue, contain the same express statutory requirement. *See* 18 U.S.C. § 1951(b)(2) (proscribing the "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."); 18 U.S.C. § 666(a)(1)(B) (making it illegal for a local public official to "corruptly solicit[] or demand[] for the benefit of any person, or accept[] or agree[] to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions" of the local government "involving any thing of value of $5,000 or more"); 18 U.S.C. §§ 1341 & 1346 (criminalizing the use of the mails for the purpose of executing a "scheme or artifice to deprive another of the intangible right of honest services"); Conn. Gen. Stat. 53a-148(a) ("A public servant or a person selected to be a public servant is guilty of bribe receiving if he solicits, accepts or agrees to accept from another person any benefit for, because of, or as consideration for his decision, opinion, recommendation or vote.").

Nor is there any principled reason to extend *Sun-Diamond*'s holding beyond the illegal gratuity context. Undergirding the Court's decision in *Sun-Diamond* was a need to distinguish legal gratuities (given to curry favor because of an official's position) from illegal gratuities (given because of a specific act). The Court offered a strictly worded requirement that the government show a link to a "specific official act" to supply a limiting principle that would distinguish an illegal gratuity from a legal one. The same limiting principle is not needed in the extortion or bribery contexts, however, because it is the requirement of an intent to perform an act in exchange for a benefit—i.e., the quid pro quo agreement—that distinguishes those crimes

20

from both legal and illegal gratuities. *See United States v. Alfisi*, 308 F.3d 144, 149-52 (2d Cir. 2002) (declining to extend *Sun-Diamond*'s holding to bribery under 18 U.S.C. § 201(b)(1)(A) which contains the element of a quid pro quo or a direct exchange).

Thus, now, as before *Sun-Diamond*, so long as the jury finds that an official accepted gifts in exchange for a promise to perform official acts for the giver, it need not find that the specific act to be performed was identified at the time of the promise, nor need it link each specific benefit to a single official act. To require otherwise could subvert the ends of justice in cases—such as the one before us—involving ongoing schemes. In our view, a scheme involving payments at regular intervals in exchange for specific officials acts as the opportunities to commit those acts arise does not dilute the requisite criminal intent or make the scheme any less "extortionate." Indeed, a reading of the statute that excluded such schemes would legalize some of the most pervasive and entrenched corruption, and cannot be what Congress intended.

Our post-*Sun Diamond* decision in *United States v. Middlemiss*, 217 F.3d 112 (2d Cir. 2000), upon which Ganim relies, does not suggest otherwise. In *Middlemiss*, the victim paid defendants monthly payments of $2,000, and a final payment of $45,000, "because [the victim] reasonably believed that [the defendants] had power to influence airport and other officials who could terminate his cafeteria lease or begin administrative investigations into the health and tax code compliance of his businesses." *Id.* at 117. We found no plain error in a Hobbs Act jury instruction that the defendants "had to know a link" existed between the payments and their acts. *Id.* at 121-22. Contrary to Ganim's suggestion, we did not extend *Sun-Diamond*'s holding to the extortion context in *Middlemiss*. We simply noted that the jury charge at issue in *Middlemiss*, unlike the one in *Sun-Diamond*, conveyed that the official "had to know a link existed" between

21

the money paid and the official act performed, and for that reason defendant's reliance on *Sun-Diamond* was unavailing. Neither the jury charge nor our decision, however, required a direct this-for-that relationship between each payment and benefit. Rather, we explained that the government, more generally, "'need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.'" *Id.* at 117 (quoting *United States v. Delano*, 55 F.3d 720, 731 (2d Cir. 1995)).

In short, requiring a jury to find a quid pro quo, as governing law does, ensures that a particular payment is made in exchange for a *commitment* to perform official acts to benefit the payor in the future. Once the quid pro quo has been established, however, the specific transactions comprising the illegal scheme need not match up this for that. While it frequently will be true that particular bribes or extorted payments are linked at the time of the corrupt agreement to particular official acts, that will not always be the case—for example, because the opportunity to undertake the requested act has not arisen, or because the payment is one of a series to ensure an ongoing commitment to perform acts to further the payor's interests. Accordingly, the Hobbs Act jury instructions were not erroneous.

### C. "Honest Services" Mail Fraud

#### 1. Relevant Law

Title 18, Section 1341 of the United States Code criminalizes the use of the mails for the purpose of executing a "scheme or artifice to defraud." 18 U.S.C. § 1341. When mail fraud is prosecuted as a scheme or artifice "to deprive another of the intangible right of honest services," 18 U.S.C. § 1346, it is referred to as "honest services mail fraud"; when it is prosecuted simply as a scheme to deprive another of property by means of false pretenses, it is referred to as

22

"traditional mail fraud." The government clarified during pretrial proceedings that it would prosecute the honest services mail fraud charges "as a scheme to deprive the citizenry of Ganim's honest services by bribery of (or extortion by) an elected official." *See United States v. Ganim*, 225 F. Supp. 2d 145, 147 (D. Conn. 2002). Thus, the honest services mail fraud charges—which are the only ones challenged here—were all tried under the substantive law of either extortion or bribery.[7]

Like extortion, the crime of bribery requires a quid pro quo. *See, e.g., Alfisi*, 308 F.3d at 148 ("[B]ribery . . . requires a quid pro quo element."); *see also Sun-Diamond,* 526 U.S. at 405 (distinguishing an illegal gratuity from a bribe which "requires proof of a quid pro quo"). And, like in the extortion cases, donors and recipients engaged in ongoing bribery schemes do not always spell out in advance the specific match between gift and act. For example, in *United States v. Bonito*, 57 F.3d 167 (2d Cir. 1995), we upheld the conviction of a real estate developer who gave a car to a city housing official as a bribe, but when the deal the developer hoped the official could ensure fell through, the official found other ways of using his position for the developer's financial benefit. *Id.* at 169-71, 174. We found the jury charge sufficient because it

---

[7] For purposes of this appeal, we presume that the same standard for proving a quid pro quo exists under both 18 U.S.C. § 666 and § 201(b)(1), as neither party has argued that there is, or should be, any difference of which we should be cognizant. *See United States v. Ford*, 435 F.3d 204, 213 (2d Cir. 2006) (citing *Sun-Diamond* for the proposition that bribery under § 666 requires a quid pro quo); *Alfisi*, 308 F.3d at 149 (citing *Sun-Diamond* for the proposition that bribery under § 201(b)(1) requires a quid pro quo). We note here, and have held previously, that there are other differences between the two provisions that are salient under circumstances not present here. *See Ford*, 435 F.3d at 210 & n.2, 213-14 & n.5 (stating that "the language of the two provisions differs in significant respects," including that "Section 201 lacks an explicit intent requirement as to recipients of alleged bribes while Section 666 contains one," and concluding that those differences were important with respect to the level of awareness each provision required of the recipient of a bribe).

required the jury to find a corrupt intent on the part of the payor to influence the performance of official acts. *Id.* at 171.

The Fourth Circuit also shares our view that, in order to establish the quid pro quo essential to proving bribery, "the government need not show that the defendant intended for his payments to be tied to specific official acts (or omissions)." *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998). In *Jennings*, a construction contractor was convicted of federal programs bribery under 18 U.S.C. § 666(a)(2) for giving a series of cash payments to a city official responsible for awarding jobs renovating vacant housing units. *Id.* at 1010-12. In return for the money, the official steered contracts to Jennings worth hundreds of thousands of dollars. *Id.* In upholding the bribery conviction, the Fourth Circuit emphasized that bribery required an intent to effect an exchange, but that "each payment need not be correlated with a specific official act. . . . In other words, the intended exchange in bribery can be 'this for these' or 'these for these', not just 'this for that.'" *Id.* at 1014 (internal citation omitted). Thus, bribery can be accomplished through an ongoing course of conduct, so long as evidence shows that the "favors and gifts flowing to a public official [are] *in exchange for* a pattern of official actions favorable to the donor." *Id.* (emphasis in original) (internal quotation omitted).

### 2. Jury Charge

The district court charged the jury that it could convict Ganim for honest services mail fraud if the jury found that he engaged in a scheme to receive something of value either through bribery or through extortion.[8] As the jury had already been instructed on the elements of

---

[8] The jury was charged on the law of honest services mail fraud in connection with Count 1 (racketeering acts 1B, 1C, 1D, 2B, 3A, 3B, 4A, 4B, 7B, 7C, 7D, 7E, 8B and 9), and, for Counts 4-6, 8, 14, 17 and 19, was referred back to the charge on the related racketeering acts.

extortion, the court turned to the crime of bribery:

> The term "bribe" means a corrupt payment that a public official accepted or agreed to accept with the intent to be influenced in the performance of his or her public duties. *A bribe requires some specific quid pro quo, a Latin phrase meaning this for that or these for those, that is, a specific official action in return for the payment or benefit. If the public official knows that he or she is expected as a result of the payment to exercise particular kinds of influence or decision making to the benefit of the payor, and, at the time the payment is accepted, intended to do so as specific opportunities arose, that is bribery.*

> * * *

> [B]ribery is not proved if the benefit is intended to be, and accepted as simply an effort to buy favor or generalized goodwill from a public official who either has been, is, or may be at some unknown, unspecified later time, be in a position to act favorably on the giver's interests—favorably to the giver's interest. That describes legal lobbying.

> * * *

> Public officials may lawfully receive a campaign contribution, and he or she may also lawfully accept a personal benefit if his or her intent in taking those items is solely to cultivate a relationship with the person or persons who provided them. (emphasis added).

Once again, Ganim objects that by permitting the jury to convict based on the defendant's knowledge that he is "expected as a result of the payment to exercise particular kinds of influence or decision making to the benefit of the payor, and, at the time payment is accepted, intended to do so as specific opportunities arose," the charge was improperly broad. Ganim argues that the later instruction—that accepting a benefit that is "intended to . . . buy favor or generalized goodwill" from an official who may "at some unknown, unspecified later time, be in a position to act favorably"—did not cure the earlier error because the two instructions "cannot be reconciled."

We find no error in the instruction. Even more specifically than did the charge on

25

extortion, the passage quoted above explained that "[a] bribe requires some specific quid pro quo . . . that is, a specific official action in return for the payment or benefit." This statement conformed even to the heightened conception of a quid pro quo that Ganim urges this Court to adopt. Further, the district court set forth in detail the type of "legal lobbying" that is *not* bribery—the precise activity Ganim is concerned an overly broad charge could sweep up. Taken as a whole, this charge "provided the jury with an intelligible and accurate portrayal of the applicable law" pertaining to bribery and thus to honest services mail fraud. *United States v. Weintraub*, 273 F.3d 131, 151(2d Cir. 2001). And, for the reasons explained above, his reliance on *Sun-Diamond* is misplaced. *Cf. Alfisi*, 308 F.3d at 151 n.4 ("We do not agree that *Sun-Diamond* requires us to define the crime of bribery narrowly. . . . *Sun-Diamond* . . . says nothing about bribery . . . .").

### D. Federal Programs Bribery and Bribe Receipt Under Connecticut Law

#### 1. Relevant Law

One is guilty of a crime under 18 U.S.C. § 666 if he is an agent of local government and "corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions" of the local government "involving any thing of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B). The parties agree that, for purposes of this case, the law of bribe receiving under Connecticut law is governed by the same legal framework pertaining to 18 U.S.C. § 666.[9]

---

[9] The jury was charged on the law of federal programs bribery in connection with Count 7, and referred back to that charge in connection with the counts of conspiracy to commit federal programs bribery, Counts 16 and 20. The jury was charged on the law of bribe receiving under

We have interpreted § 666 to impose criminal liability for both kinds of crime proscribed by § 201: bribery and illegal gratuities. Specifically, we held in *United States v. Crozier*, 987 F.2d 893 (2d Cir. 1993), that a predecessor of the current § 666 criminalized both bribery and illegal gratuities, because that statute's language making it a crime to accept a thing of value for or because of the recipient's conduct in any transactions "includes both past acts supporting a gratuity theory and future acts necessary for a bribery theory." *Id.* at 899. Although the current version of the statute does not contain the "for or because of" language, we held in *Bonito* that "the deleted language has been replaced with language that is to the same effect"—namely, that "the payment must be 'to influence or reward' the official conduct." 57 F.3d at 171 (quoting 18 U.S.C. § 666(a)(1)(B)). We intimated there that a payment made to "influence" connotes bribery, whereas a payment made to "reward" connotes an illegal gratuity. *Id.; cf. Sun-Diamond*, 526 U.S. at 404-05 (explaining that under 18 U.S.C. § 201, "[b]ribery requires intent 'to influence'" whereas an illegal gratuity "may constitute merely a reward for some future act"). The government implicitly agreed in its brief that § 666 proscribes both bribery and gratuities, and confirmed at oral argument that it agreed to prosecute violations of the statute as bribery only.

### 2. Jury Charge

The district court's charge on federal programs bribery instructed the jury, in pertinent

---

Connecticut law in connection with Count 1 (racketeering acts 2A, 7A, 81, 8C, 8D, 10A). Ganim's brief expressed the position that he treats the substantive law under the Connecticut bribe receiving statute as identical, for purposes relevant to this appeal, to bribery under federal law. The government confirmed at oral argument that it held the same position. We do not address the jury instruction for the charges based on bribe receiving under Connecticut law because Ganim has not separately challenged those instructions, except in a passing footnote in his reply brief, and on grounds not presented to the district court.

part, as follows:

> The third element that the government must prove is that the defendant acted with the corrupt intent to be influenced or rewarded in connection with some business, transaction or series of transactions of the City of Bridgeport itself or one of its agencies. *A "corrupt intent" means the intent to engage in some specific quid pro quo . . .* or the intent to give some advantage inconsistent with official duty and the rights of others. "Corruptly" means having an improper motive or purpose.

> Put another way, a public official acts corruptly if he solicits, accepts or agrees to accept a personal benefit, at least in part, *with the intent to be improperly influenced or rewarded* in connection with the performance of an official act. The motive to act corruptly is ordinarily a hope or an expectation of either financial gain or other benefit to one's self or some profit or benefit to another. (emphasis added).

The jury charge language that Ganim objects to with respect to the other bribery-related crimes —i.e., phrases like "kinds of influence" or "as specific opportunities arise"—are absent from this charge. Ganim argues, however, that the instruction "incorporates its own, unique error" in the form of the word "rewarded." He claims the district court's use of the word "reward," in the second paragraph above, permitted the jury to convict Ganim on a gratuities theory rather than a bribery theory.[10]

Given the law in this circuit, *see, e.g., Bonito*, 57 F.3d at 171, the inclusion of the word "rewarded" in the charge introduced unnecessary ambiguity as it may have implied an illegal gratuity theory which the government, in fact, had not pursued. Future courts, cognizant of the gratuity/bribery distinction in § 666 prosecutions, should endeavor to be more precise. Ganim, however, failed to object to the "influenced or rewarded" language at trial, despite raising a

---

[10] Ganim also objects to the charge's reference to a "series of transactions," which "watered down the quid pro quo" by eliminating the requirement that the benefit be linked to a single, specific act. As the government notes, the phrase appears in the statute itself, so there is no error.

different objection to the § 666 instruction that is not at issue in this appeal.[11]  We therefore

review the charge for plain error, reversing only if the error is clear or obvious and affects

substantial rights.  *United States v. Olano*, 507 U.S. 725, 733-34 (1993).  To affect substantial

rights, an error "must have been prejudicial:  It must have affected the outcome of the district

court proceedings."  *Id.* at 734.

Here, it was not clear or obvious that using the word "reward" was error, particularly

because the phrase "influenced or rewarded" is contained in the statute itself.  18 U.S.C.

§ 666(a)(1)(B).  Moreover, it is unlikely that including the word had any effect at all, much less

one "affect[ing] the outcome of the district court proceedings."  *Olano*, 507 U.S. at 734.  That is,

we cannot conclude that the charge as given permitted the jury to convict on a gratuities theory.

A jury would not have understood the word "reward" to have any particular legal meaning

beyond that ascribed to it in the instructions, and the district court plainly instructed the jury that

to convict Ganim of federal programs bribery, it would have to find a "specific quid pro quo."

As *Sun-Diamond* explained, what distinguishes a bribe from a gratuity is its intent element: only

bribery requires "the specific intent to give or receive something of value *in exchange* for an

official act."  *Sun-Diamond*, 526 U.S. at 404-05 (emphasis in orginal).  Because the jury was

required to find that element, it necessarily convicted Ganim of bribery under 18 U.S.C. § 666,

rather than the lesser included offense of receiving illegal gratuities.  Thus, to the extent there

was error in the § 666 jury instruction, it was not plain error.

---

[11] Indeed, the Defendant's Requests to Charge filed with the district court itself included
the phrase "intending to be influenced or rewarded," not once but three times.

**CONCLUSION**

For the foregoing reasons, we hold that the jury instructions required the jury to find a sufficiently specific nexus between the personal benefits Ganim received and the official acts he agreed to perform in return for them. And for the additional reasons discussed in our accompanying summary order, we AFFIRM the judgment of conviction.